**GENERAL INVESTMENT & DEVELOPMENT CO., et al., Plaintiffs,**

v.

**GUARDIAN SAVINGS AND LOAN ASSOCIATION, et al., Defendants.**

Civ. A. No. H–93–1597.

United States District Court, S.D. Texas, Houston Division.

Aug. 26, 1994.

Alton F. Curry, Houston, TX, for plaintiffs.

Robin C. Gibbs, Houston, TX, for defendants.

OPINION ON SUMMARY JUDGMENT

HUGHES, District Judge.

### 1. *Introduction.*

Before the court is a purchase and sale agreement. The buyer has sued the seller for specific performance of the contract to purchase investment real estate from the repossessed real estate portfolio of a financial institution. Because the terms of the agreement protect the seller from the reasonable consequences of its actions, the buyer will take nothing.

### 2. *Facts.*

Guardian Savings & Loan Association owns three multi-family rental housing communities with over 1,300 apartments. Guardian contracted to sell the properties to General Investment & Development Company. For three months, the parties worked to consummate a deal, but it fell apart.

January 29, 1993: Guardian and General executed the January 28, 1993, Purchase and Sale Agreement. The agreement has a March 1, 1993, closing deadline (¶ 4.1). Guardian will furnish General with just over $70 million of wraparound financing to complete the $80 million deal. In the last draft before the agreement was signed, the parties added that Guardian does not have to perform unless it gets approval from the Office of Thrift Supervision (OTS) of the agreement and all related transactions "in a manner that is satisfactory to Guardian" (¶ 9.1(b)). Guardian is obliged to seek regulatory approval, both from OTS and the Texas Savings and Loans Department. Guardian's board of directors also has to approve the deal, and notice of both approvals has to be sent to General within 30 days after the effective date of the agreement (January 29, 1993).

February 1, 1993: Stuart Johnson, General's counsel, wrote a letter to Vic Condrey, counsel to Guardian and a member of Guardian's board of directors, stating General's expectation that Guardian was "gearing up" on obtaining regulatory approval.

February 16, 1993: Condrey told Johnson that Robert Parker, Guardian's chairman, James Liska, Guardian's senior vice president, and Daniel Goldberg, Guardian's legal counsel, were handling the request to OTS for approval.

February 23, 1993: Johnson again asked Condrey about the status of regulatory approval.

Mar. 1, 1993: On the initial date of closing, the parties executed the first amendment to the agreement extending the closing date to March 3, 1993.

Mar. 5, 1993: Two days after the extended closing date, the parties executed the second amendment to the agreement extending the closing date to March 12, 1993.

Mar. 8, 1993: Robert DeWitt, General's vice president in charge of the deal, called Liska, to inquire about the status of the OTS approval. Liska told him that approval had not been sought but that delay was not a concern because the OTS could approve within two days. DeWitt expressed his concern about approval being obtained before March 12. DeWitt told Liska that General would be prepared to close on time.

Mar. 11, 1993: General sent Guardian a proposed third amendment to extend the closing to March 26. Guardian did not execute the proposed amendment before March 12.

Mar. 15, 1993: DeWitt wrote to his colleagues at General informing them that the agreement had "officially expired."

Mar. 19, 1993: Steven Smith, one of Guardian's outside lawyers, wrote General to inform it that (a) the deadline had passed, (b) Guardian was not executing the proposed third amendment, and (c) no extension of the closing date was effective without a written document.

Mar. 25, 1993: Two weeks after the third closing date passed, Guardian's board of directors approved and ratified the agreement; this was the first time the board considered the matter.

Mar. 25, 1993: For the first time, Guardian asked for OTS and Texas approval of the

deal. Guardian also asked that the loans required by the agreement not be classified. General did not know of this request. The parties continued to work toward a deal, despite no written extension of the closing date.

April 16, 1993: Sometime in April, Guardian for the first time told General that it needed that the loans not be classified. General agreed to help and proposed to the OTS an increase in the collateral of an additional $5 million.

April 20, 1993: The OTS rejected Guardian's request not to classify the loans. At the same time, the OTS approved the deal with no conditions.

April 23, 1993: Guardian told General of the refusal not to classify. By this time General was aware that unless the loans to it could be counted for Guardian's required capital, the deal was dead.

April 29, 1993: General again amended its collateral offer, this time to $10 million.

May 4, 1993: The OTS rejected Guardian's request for non-classification even with the improved collateral from General.

May 14, 1993: Guardian told General the deal was off.

May 27, 1993: General filed suit for specific performance, common-law fraud, statutory fraud, and negligent misrepresentation.

### 3. *Claims.*

General argues that the purchase and sale agreement was breached by Guardian's failure to request the approvals required by the agreement before the closing date. General also asserts that the parties' actions before and after March 12 served to extend the closing date contractually through May so that Guardian's May 14 declaration that the deal was off was a breach. General argues that Guardian's material breach allows it specific performance of the deal according to the terms of the agreement.

Guardian asserts two defenses: (a) The phrase in the agreement "in a manner satisfactory to Guardian" combined with OTS's refusal to declassify the loans lets it out of the agreement and (b) the agreement expired on March 12 and was not revived by the parties.

### 4. *Classification.*

Guardian begins its defense with a simple proposition. It states that the agreement contemplates Guardian's receiving approval from the OTS "in a manner that is satisfactory to Guardian." Purchase and Sale Agreement ¶ 9.1(b). It is undisputed that the OTS approved the sale, but at the same time, it refused Guardian's request to declassify the loans required by the deal. Since this disapproval was not to Guardian's satisfaction, Guardian does not have to perform because a condition precedent to its performance did not occur.

General argues that the classification issue is wholly unrelated to the approval that Guardian was seeking. Since Guardian never told General that classification was an issue until three months after the agreement was executed, and one month after it requested non-classification, Guardian cannot use the OTS's disapproval as a reason to back out of the deal.

The wrap-around loans contemplated by the agreement were a re-working of the old loans that were defaulted, resulting in Guardian's ownership of the properties. Classification refers to the category that the OTS assigns to an asset. If the loans are not classified, they are standard-risk loans. Classification ranges from substandard to doubtful to loss. Guardian, a savings and loan, is under a strict capital directive. By obtaining non-classification of these loans, Guardian would be better able to meet that directive. *See* 12 C.F.R. § 563.160(b)–(c).

■ Guardian asserts that the satisfaction clause must be read subjectively. That is only the case if General has not performed under the agreement. *See Watkins v. Williamson,* 869 S.W.2d 383 (Tex.App.—Dallas 1993, no writ). General had performed by May when Guardian told General that there would be no deal. Guardian argues that General did not perform by the time the agreement expired. If, as Guardian asserts, the clause is an absolute bar to Guardian's obligation to perform, then General's eventu-

al performance is relevant, and an objective standard applies.

■ The satisfaction provision at issue has an implicit reasonableness standard. *See Crantex Inc. v. Precision Crane & Rigging,* 760 S.W.2d 298, 302 (Tex.App.—Texarkana 1988, writ denied). Guardian confuses "satisfactory" with "sole discretion." When the parties to this agreement wanted to commit an obligation to the sole discretion of one of the parties they used that language.

The original purchase and sale agreement provided that a replacement letter of credit be available to Guardian in "its reasonable discretion." When the parties agreed to a second extension of the closing date, they amended the letter of credit provision to read "its sole discretion." *See* Agreement ¶ 3.2(e), *as amended by* Second Amendment to the Agreement ¶ 4 (March 5, 1993).

■ If the OTS had approved the sale but had added conditions, Guardian's rejection of that approval would have been reasonable under the satisfaction clause, but this is not what occurred. Guardian, separate from seeking approval of the deal, also sought regulatory approval of non-classification of the loans. It did so even though it was unnecessary for OTS approval of the deal. Guardian's assertions that it was highly important to it is irrelevant, considering its failure to inform General of that fact until April.

Guardian further asserts that General's assistance in trying to get OTS approval for non-classification after General was informed of the problem is an acceptance of the *necessity* for approval. General's good faith effort to do what it could to close the deal contrasts with Guardian's bad faith legal assertion. Guardian's rejection of OTS approval was unreasonable. Guardian may not rely on its failure to achieve declassification to excuse performance under the agreement.

5. *Seeking Regulatory and Board of Directors's Approval.*

■ General argues that Guardian's failure to seek approval from its board of directors and from the two regulatory bodies before the agreement expired of its own terms on March 12 is a breach of the agreement. General asserts that Guardian owed an implied duty diligently to pursue the regulatory approval.

Guardian responds that the agreement did not specify by when Guardian had to seek approval, that they had the sole option to waive the relevant conditions precedent, and that Guardian's obligation to close the transaction did not arise until Guardian in writing notified General of OTS and its board's approval of the sale.

> This Agreement and all transactions required or contemplated by this Agreement must be approved by the Board of Directors of Sellers and the office of Thrift Supervision ("OTS") and the Texas Savings and Loan Department in a manner that is satisfactory to Guardian on or before thirty (30) days after the Effective Date hereof. If Sellers have not notified Purchasers in writing of (i) their approval of Purchasers' financial documents or information and (ii) the approval of this Agreement by its Board of Directors and the OTS, on or before thirty (30) days from the Effective Date hereof pursuant to its rights under this *Section 9.1,* then approval of such documents and this Agreement will be deemed to have been refused and this Agreement shall be null and void and the Deposit, together with 100% of the accrued interest thereon, shall be returned to Purchasers.

Agreement ¶ 9.1(b).

The court agrees with General that Guardian owed it an implied duty under the terms of the agreement to seek the specified approvals. *See, e.g., McDaniel v. Kudlik,* 598 S.W.2d 350, 351 (Tex.Civ.App.—Houston [14th Dist.] 1980, writ ref'd n.r.e.). Guardian strenuously contends that the agreement, and all obligations under it, expired on March 12. Assuming that to be the case, it was under an obligation to seek regulatory approval before that date. At a minimum, Guardian had to attempt to fulfill its conditions precedent. It did not.

Moreover, while the agreement did not specify when Guardian had to seek regulatory approval, it did specify that the approval

had to be received "on or before thirty days of the effective date." That date was February 28, one day before the original closing date. The later extensions of the closing date served to extend the deadline for regulatory and board approval to the new closing date. Failure to seek approval of any sort until March 25 is a breach.

Guardian had the option to waive the condition precedent of OTS approval. Agreement ¶ 9.1. It did not, however. Guardian contends that the failure to receive OTS approval of the non-classification of its loans, whatever approval of the deal, excuses it from performance. Guardian cannot have it both ways. If OTS's failure to approve absolves Guardian of its obligations, then Guardian cannot benefit from an unused option to waive a condition precedent.

Finally, Guardian's assertion that its not having sent notice prevents its breach is rejected. The agreement states that Guardian may indicate the rejection of the deal by its board or regulatory authorities merely by not having notified General in writing of Guardian's obtaining the approval of those bodies. Agreement ¶ 9.1(b)(i) & (ii). This does not absolve Guardian from failing to have sought that approval before the final closing date. Guardian breached the contract.

### 6. *Damages.*

■ Guardian asserts that even if the failure to seek the required approvals is a breach of the agreement, no damage was done to General because General was unable to perform at the time of Guardian's breach. Guardian is correct.

■ Texas law requires a party to show the ability to perform under a contract at the time of the other's breach to recover damages. *See Incorporated Carriers, Ltd. v. Crocker,* 639 S.W.2d 338, 340 (Tex.App.— Texarkana 1982, no writ); *Howell v. Kelly,* 534 S.W.2d 737, 740 (Tex.Civ.App.—Houston [1st Dist.] 1976, no writ). A party cannot recover unless the breach denied it the opportunity to perform. *See Cornerstone Group, Inc. v. Stone,* 710 S.W.2d 817, 819 (Tex.App.—Ft. Worth 1986, no writ).

It is undisputed that neither party was ready to perform under the agreement until May at the earliest. Stuart Johnson, General's counsel, candidly admitted that open issues, material to the deal, remained to be resolved on March 12. Johnson specifically stated that the parties did not resolve these disputes until May.

Robert DeWitt's last-minute affidavit does not say otherwise. DeWitt, General's vice president who was in charge of the deal, states that on March 8 he told James Liska of Guardian that General "would be prepared to close on time." Assuming that to be true, the statement is not evidence that on March 12 General was, in fact, ready to close the deal. It does not contradict Johnson's testimony.

Guardian's breach of the approval provisions is hardly honorable but it does not generate damages. The parties were not ready to close this deal by the last contractually binding closing date. The dispositive question is, after the March 12 closing date had passed, whether Guardian had a further obligation to close the deal or whether all of its obligations under the agreement expired March 12th.

### 7. *Termination of the Agreement.*

It is undisputed that Guardian's May 14 communication to General that the deal was off would be a breach of the agreement if the agreement was still in effect. It is also undisputed that the agreement expired of its own terms on March 12, after the second extended closing deadline passed. *See* Agreement ¶ 4.1, *as amended by* Second Amendment to the Agreement ¶ 1. What is disputed is whether Guardian's conduct both before and after March 12 extended the agreement.

The parties continued to work toward an agreement after March 12. Guardian went ahead and obtained the necessary approvals by its board, OTS, and Texas Savings and Loan Department. The parties came to an agreement on most of the outstanding issues. General went to great effort to bolster the collateral supporting the loans so that Guardian could achieve non-classification. There is

no dispute that the parties worked for almost two additional months to close this deal.

On the other hand, there is no question that the agreement had expired and that both parties knew that. The agreement specifically provided that an extension of the agreement had to be in writing and executed by both parties. Agreement ¶ 19.2. The closing date was twice extended by that method. General's attempt to extend the date for a third time was explicitly rejected in writing. The man in charge of the deal for General informed his colleagues that the deal had "officially expired."

■ General argues that the course of conduct of the parties waived or extended the closing date indefinitely, or at least through May 14, when Guardian pulled out of the deal. Course of conduct may constitute a relinquishment of a right. *See FDIC v. Attayi,* 745 S.W.2d 939 (Tex.App.—Houston [1st Dist.] 1988, no writ). Waiver may be implied only where the conduct of one party causes the other to believe that waiver was intended. *See Nixon Constr. Co. v. Downs,* 441 S.W.2d 284 (Tex.Civ.App.—Houston [1st Dist.] 1969, no writ).

■ General relies on the parties' course of conduct in trying to reach agreement on a deal after March 12, but Guardian's course of conduct was very clear. It would continue to work towards a deal but only with the understanding that its obligation to close had expired and only if its requirements were met, including the regulatory status of the loans for the deal. After March 12, General could no longer rely on the existence of a binding agreement on Guardian. General cannot ignore Guardian's specific, and repeated, declarations that the agreement had expired and would not be extended. The mere fact that Guardian continued to work toward a closing is not enough to find a waiver of Guardian's right to rely on termination of the agreement. Extraordinary circumstances are required to convert a lapsed contract into a new contract by continued negotiation.

■ General asserts that Guardian's representations to the OTS after March 12 that they had an agreement to sell the property is a judicial admission that the agreement was still in effect. The letters to the OTS are not judicial admissions in the sense of a statement made by a party in a court or under oath. *See Scholl v. Home Owners Warranty Corp.,* 810 S.W.2d 464, 465–66 (Tex.App.—San Antonio 1991, no writ), *citing* BLACK's LAW DICTIONARY 44–45 (5th ed. 1979). Furthermore, the admissions are not explicit statements of the existence of a particular contract by which Guardian was bound. Statements to the OTS that a sale is pending and that Guardian needs its approval are not evidence that Guardian still was bound by the agreement or consented itself to be bound.

■ General also argues that, since the second written extension was not executed until two days after the first extended closing deadline passed, this is evidence that the agreement could expire and be revived by the parties. Yes, it is. That is simply confirmation that there was only one way to revive the agreement if it expired—by a writing signed by both parties. This requirement for a writing does not come from the expired contract but from contract law. The agreement expired, and Guardian was within its rights to refuse to close the deal any time after that expiration.

## 8. *Tortious Claims.*

■ General brings claims for common-law and statutory fraud and negligent misrepresentation. The claims for fraud are based on Guardian's failure to inform General of the type of regulatory approval that it was seeking from the OTS. General claims that it would never have entered into the agreement if it knew that a requirement for Guardian's closing the deal was obtaining unclassified loans.

It is unclear from the record whether at the time the agreement was executed Guardian knew that it would seek declassification. Assuming that it did, General was not damaged by Guardian's conduct because, as already discussed, General was not ready to close at the time that the agreement expired. Furthermore, there is simply no evidence, as General asserts, that General was induced to

enter into the agreement by Guardian with Guardian having no intent to perform under the agreement. Guardian's use of the expiration of the agreement as justification for failing to close the deal is not evidence that Guardian had no intention to perform while the agreement subsisted.

■ General's claim for fraudulent misrepresentation is similarly groundless. There is no evidence that Guardian intended to seek declassification at the time it entered into the agreement. Even if it did, the inability of the parties to come to an agreement on all outstanding issues before the agreement expired makes Guardian's omission immaterial. General cannot recover on its tortious claims.

■ Negotiating without intending actually to reach an agreement might give rise to a claim for transaction costs, but having harsh demands for an agreement is not fraud.

### 9. *Conclusion.*

The contract in this case, without doubt, gave Guardian many rights and protections. Texas law prevents its most generous provisions from being read to turn the contract into an option on the part of Guardian. The provisions mandating a closing date and requiring an extension to be in writing, however, protected both parties. Guardian just happens to be the one who took advantage of it.

### FINAL JUDGMENT

General Investment & Development Company, Windsor Realty Fund—ILP, Sherwood Crossing Investors Corporation, and Rolling Brook/Wood Hollow Investors Corporation take nothing from Guardian Savings and Loan Association and Residenz Parkway, Incorporated.